THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KELVIN NORWOOD, Defendant-Appellant.

First District (6th Division)   No. 1—04—1177

Opinion filed December 16, 2005.—Rehearing denied January 23, 2006.

Aaron M. Forester and Jay Williams, both of Schiff Hardin, LLP, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Michelle Katz, and C. Thor Martin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FITZGERALD SMITH delivered the opinion of the court:

A jury found defendant Kelvin Norwood guilty of aggravated arson

and first degree murder committed in an exceptionally brutal or heinous manner indicative of wanton cruelty. The trial court sentenced him to an extended term of 100 years for first degree murder and a consecutive term of 20 years for aggravated arson. On appeal, defendant argues that (1) the trial court improperly admitted evidence of defendant's other crimes and bad acts; (2) the State minimized its burden of proof during closing argument; and (3) the trial court improperly denied defendant's motion to waive a jury determination of the wanton cruelty, extended-term sentencing issue. For the reasons that follow, we affirm the judgment of the trial court.

## I. BACKGROUND

On Monday evening, January 31, 2000, firefighters responding to a fire discovered Maryanne Norwood's charred remains in her Chicago apartment. She died of multiple stab wounds and her apartment was burned at some point after her death. Defendant, the victim's son, was arrested in Springfield on February 1, 2000, and later charged with multiple crimes, including first degree murder accompanied by exceptionally brutal or heinous behavior, arson, burglary of a trucking company, possession of a stolen motor vehicle from the trucking company, and possession of burglary tools.

Defendant demanded a jury trial but moved to waive his rights pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), to have a jury determine whether exceptionally brutal or heinous behavior existed. The trial court denied the motion, ruling that defendant could not request a jury trial on the charges and waive the jury determination on the particular factual issue related to the imposition of an extended-term sentence. Defendant also moved to dismiss the brutal and heinous behavior counts as invalid, arguing the additional fact was not an element of first degree murder. The trial court denied the motion, ruling that the State properly alleged brutal and heinous behavior in the charging instrument. Defendant also moved to bifurcate the hearing to prove the existence of exceptionally brutal or heinous behavior only after and if the jury returned a guilty verdict for first degree murder. The defense argued it would be very prejudicial for the jury to consider defendant's guilt or innocence simultaneously with evidence, like graphic photographs, associated with the brutal and heinous nature of the crime. The trial court denied the motion, noting that the photographic evidence was admissible regardless of the extended-term sentencing issue.

The court granted defendant's motion to sever the counts of burglary, possession of the stolen truck, and possession of burglary tools. However, the court reserved ruling on the admissibility of

evidence concerning the burglary, stolen truck, and circumstances of defendant's arrest as relevant other-crimes evidence with regard to the murder and arson charges. The court reasoned that the relevance and prejudice of the other-crimes evidence would be better understood in context during the course of the trial.

At the trial for murder and arson, the State presented evidence that the victim rented an apartment above her landlords, Willie and Hazel Hubbard, for about six years before the fire. About December 1999, the victim introduced defendant to her landlords and asked if defendant could live with her. Defendant sat in the Hubbards' living room with Mr. Hubbard while the victim spoke with Mrs. Hubbard in the kitchen. The Hubbards allowed defendant to move into the victim's apartment.

On Thursday, January 27, 2000, the victim, during a telephone conversation with her sister Amy Harrison, explained that she wanted to "put [defendant] out." The victim also had two telephone conversations with her sister Annie Bibbs about 10:30 p.m. and 1 a.m. The victim also had an hour-long telephone conversation with defendant's girlfriend Connie Burage, who had been dating defendant for a month after meeting him at a Narcotics Anonymous meeting. When defendant returned Burage's telephone call about 1 a.m., she asked him why he took the victim's money and what was going on. Defendant responded that he lost his job, was depressed and wanted to get high.

On Friday morning, January 28, 2000, Burage telephoned the victim, who said she did not want defendant to stay at her apartment anymore. The victim also spoke with Harrison, stating that she wanted to help defendant get off drugs and into church. She also wanted defendant, who was giving her a hard time, to leave.

On Saturday afternoon, January 29, 2000, the victim told Bibbs that she was going to take defendant to a minister to get him help. The victim also went downstairs and gave Mrs. Hubbard a dish of mixed greens. Neither the Hubbards nor the victim's sisters heard from the victim after Saturday.

When defendant and Burage spoke on Saturday, defendant said he would go to a Narcotics Anonymous meeting, but Burage decided not to go. Defendant called Burage about 9:30 p.m. and said he would go home after the meeting to get the victim's car and then buy some groceries for dinner at Burage's place. However, defendant never went to Burage's place that night. Burage telephoned the victim's apartment several times after 10 p.m., but no one answered and the answering machine did not respond. There was still no answer when Burage called at 7 a.m. Sunday morning.

About 10 a.m. on Sunday, defendant called Burage and said he had

gone to work that morning at Roosevelt Moving Company. (However, the owner of Roosevelt Moving testified that defendant had worked on Saturday but not after that day.) Defendant told Burage that he did not go to her place last night because he and the victim were arguing, she was "tripping," and she did not want him to go to Burage's home. Thereafter, defendant drove the victim's car to Burage's home and said the victim had gone shopping with one of her sisters. (However, Bibbs and Harrison testified that they did not see the victim on Sunday.) Defendant drove Burage to a Narcotics Anonymous meeting and borrowed $10 from her, saying it was for bus fare for a job interview the next day.

On Monday, January 31, defendant drove Burage to work using the victim's car. Later, about 9 p.m., defendant went to Burage's house and explained that he did not need to pick up the victim from work because she left early and was already home. (However, the victim's supervisor testified that, to his knowledge, the victim never appeared for work on January 31.) Defendant left Burage's home about 9:20 p.m. with money from Burage to purchase food for her and her children, but he failed to return.

About 10 p.m. at the victim's apartment building, Mrs. Hubbard heard the hallway smoke alarm and called to her husband, who was lying on his bed. Smoke detectors were installed in the victim's bedroom and at the landing right outside her apartment. The Hubbards met in their living room and talked briefly. The smoke alarm stopped ringing, and Mr. Hubbard heard footsteps coming down the stairs. He opened his apartment door and saw smoke coming from the second floor. In the lighted hallway, he met defendant, who stood only three feet away and appeared to be clutching something under his arm. Mr. Hubbard was not wearing his prescription glasses at the time. Defendant said that everything was okay and he had merely burned some chicken. Mrs. Hubbard heard the conversation from inside her living room and recognized defendant's voice from earlier conversations with him. Defendant left the building, and Mr. Hubbard went back into his apartment. When smoke started to enter the Hubbards' apartment, Mr. Hubbard went upstairs and found the victim's apartment doorknob was hot to the touch. He summoned the fire department.

Mr. Hubbard was 75 years old and, about one year after the fire, had surgery to remove a tumor behind one of his eyes. He insisted, however, that his vision at the time of the offense was unaffected. Furthermore, his grand jury testimony indicated that he opened the victim's apartment door but immediately closed it because the smoke was so intense and the fire was hot.

The fire department discovered the victim's charred remains lying facedown in her living room. Expert testimony established that the fire resulted from a human act and had two points of origin: one near the living room couch close to the victim's body, and the other in the bedroom on a bed. The victim sustained multiple stab wounds and blunt force trauma before the fire was set. Blows to her face broke her teeth and cheekbones and caused lacerations on her mouth and swelling in her head. She was stabbed several times, including above her left eyebrow, on her neck, behind her left ear, in her back, and on her elbow. The multiple stab wounds caused her death.

Detectives investigating the homicide discovered the victim's car at Flash Trucking, where defendant had been recently employed. During the early morning hours of February 1, 2000, Flash Trucking employees found that a Mack truck was missing. Furthermore, truck keys, a fuel card and tollway card were stolen from the office. Outside of Flash Trucking, an evidence technician recovered a plastic folder containing defendant's identification and wallet-sized photographs of his child, her mother Rachel Dixon of Springfield, Illinois, and Dixon's other children. The police also recovered a smoke detector from the rear passenger seat of the victim's car. The police investigation determined that the hallway smoke detector outside the victim's apartment was missing, and only a broken piece of its bracket remained. The State contended the missing bracket piece from the hallway smoke detector was the same part attached to the smoke detector recovered in the victim's car. Furthermore, another smoke detector mounted in the victim's bedroom was detached from its wall mount.

Defendant arrived at Dixon's home in Springfield about 7 a.m. on February 1 and parked the Flash Trucking truck in front of her house. He spent the day with Dixon, running errands and napping. About 2:30 p.m., the doorbell rang, and Dixon answered it while defendant stood behind her. Gary Mendenhall identified himself as being with the Department of Corrections, raised his gun and told defendant to come out with his hands up. Defendant pushed Dixon outside and shut the door. Through the door, defendant told Dixon to get Mendenhall's phone number so defendant could telephone him from inside the house. Dixon's infant was crying inside the house, and defendant said he would give Dixon the infant if Mendenhall backed away from the door. However, when Dixon reached for the infant, defendant pulled her back inside the house. Defendant instructed Dixon to hold the baby and walk with him as he paced. He called 911 in an unsuccessful attempt to speak to Mendenhall. He retrieved a steak knife from the kitchen and put it underneath the bedroom mattress. When Mendenhall tried to kick in the front door, defendant grabbed Dixon around

her neck and chest as she held the baby and sat on the ground with his back against the door and his feet braced against the wall.

Mendenhall and two responding officers kicked open the back door and entered the living room with their guns drawn. Defendant let the officers take the infant but pressed a mobile phone to Dixon's back and told her to tell the officers that he had a weapon at her back. Defendant then released Dixon, who did not comply with his instruction. The officers then arrested defendant.

In accordance with the trial court's prior ruling concerning other-crimes evidence, the State did not elicit testimony that defendant was on parole or that there was a parole violation. During Dixon's cross-examination, defense counsel elicited testimony that Mendenhall pointed his gun above Dixon's head while defendant stood behind her, defendant slammed the door shut, and Springfield police officers arrived on the scene after defendant called 911. At a sidebar, the prosecutors argued that defense counsel had now opened the door to allow the prosecution to elicit testimony that defendant knew the man at the door was a parole officer. The prosecution argued that the cross-examination had given the jury the impression that defendant slammed the door and called 911 because a man came to Dixon's door and pointed a gun at them. Defense counsel responded that the purpose of the questioning was to explain why defendant slammed the door and called 911.

The trial court ruled that the State had relevant evidence regarding why defendant slammed the door closed and, due to the defense's intimation during cross-examination, the probative value of that other-crimes evidence now outweighed its prejudicial nature. Dixon could not testify that Mendenhall announced that defendant was wanted for a murder case, but the prosecution now could elicit the testimony that defendant knew that he was on parole and said he was wanted for a violation. The trial court also agreed to give the jury a limiting instruction.

On redirect, Dixon testified that when Mendenhall rang the doorbell, defendant told her Mendenhall was from the Department of Corrections. Dixon, however, thought he was from the housing authority and asked why the Department of Corrections would want to speak to defendant. Defendant responded that it was about a parole violation. When defendant called 911, he asked why officers were outside the house and indicated that he wanted to speak with the officers.

After that testimony, the court explained to the jury that evidence was received that defendant was involved in offenses other than those charged in the indictment. That evidence was received on the issues of defendant's design and the circumstances surrounding his arrest and

could be considered by the jury only for those limited purposes. The jury must determine whether defendant was involved in those offenses and the weight to give that evidence on the issues of design and the circumstances surrounding his arrest.

After defendant's arrest, he telephoned Burage from Springfield. She asked him what happened and whether he hurt his mother and told him his mother had died. He denied killing his mother and sounded like he was pretending to cry. He tried to convince Burage that he was at her house at 10 p.m. on the night of the fire, but Burage responded that he left her house at 9:20 p.m.

After closing argument, the jury returned a verdict of guilty for aggravated arson, first degree murder, and first degree murder accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court denied defendant's motion for a new trial and thereafter sentenced him to an extended-term sentence of 100 years for first degree murder accompanied by brutal or heinous behavior and a consecutive term of 20 years for aggravated arson. Defendant appealed.

## II. ANALYSIS

### A. Other-Crimes Evidence

Defendant contends the trial court abused its discretion by allowing the State to use evidence concerning his other crimes and prior bad acts. Defendant argues evidence concerning his alleged drug use, theft of money from the victim, theft and burglary at Flash Trucking, and parole status was irrelevant, highly prejudicial and served only to show that he had a propensity to commit other crimes and was a bad person deserving of punishment. Defendant argues the erroneous admission of that evidence, both individually and cumulatively, denied him a fair trial. We disagree, as the record established that the court acted within its discretion in admitting the evidence and gave the jury a limiting instruction.

■ Other-crimes evidence encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial. *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). Other-crimes evidence is admissible to prove any material fact relevant to the case (*People v. Donoho*, 204 Ill. 2d 159, 170 (2003)), but is inadmissible if it is relevant only to demonstrate a defendant's propensity to engage in criminal activity (*People v. Hendricks*, 137 Ill. 2d 31, 52 (1990)). Such evidence may be admissible when it is relevant to show, among other things, motive, intent, identity, absence of mistake or accident, *modus operandi*, or the existence of a common plan or design. *People v. Wilson*, 214 Ill. 2d

127, 135-36 (2005). However, even when relevant for a permissible purpose, other-crimes evidence may be excluded by the trial court if its prejudicial effect substantially outweighs its probative value. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991).

The admissibility of other-crimes evidence is left to the trial court's sound discretion, and we will not disturb that decision absent a clear abuse of discretion. *Wilson*, 214 Ill. 2d at 136. A trial court's determination constitutes an abuse of discretion if it is arbitrary, fanciful or unreasonable, or if no reasonable person would take the view adopted by the trial court. *Illgen*, 145 Ill. 2d at 364.

### 1. *Drug Use and Theft of Money From the Victim*

■ Defendant contends the State repeatedly and improperly elicited irrelevant and highly prejudicial testimony that he had a prior drug problem or was a drug abuser and met Burage while he was in rehabilitation for his alleged drug problems. Defendant also contends there was no direct link between the evidence regarding money he allegedly stole from the victim before the murder and arson. Although defendant contends the trial court overruled numerous defense objections to the introduction of this evidence, defendant does not support this contention by citation to the record.

According to the State, evidence of defendant's drug use and theft was admitted in the following manner. Over the defense's objection, Harrison testified that the victim said she "wanted to get [defendant] off drugs." Furthermore, without objection, Burage testified that when she asked defendant why he took the victim's money, he responded that he lost his job, was depressed and wanted to get high. Burage also testified, without objection, that she met defendant at a Narcotics Anonymous meeting and they twice discussed plans to attend Narcotics Anonymous meetings. When Dixon explained that defendant obtained a picture in his wallet from a woman he met in "rehab," the trial court sustained defendant's objection to this unsolicited response from Dixon. Our review of the record supports the State's account of the evidence concerning defendant's drug use and theft of money.

Defendant's failure to object to particular testimony fails to preserve that issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Although we do not find that the evidence here is closely balanced, we will review any forfeited issues concerning the drug and theft evidence because the erroneous admission of such other-crimes evidence could deprive a defendant of a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005).

We find that the evidence of defendant's drug use and theft of the

victim's money was admissible to show defendant's motive. Contrary to defendant's assertions on appeal, the State did not argue that defendant killed his mother to get money to use drugs but, rather, that his motive arose from their dispute over his drug use. Defendant wanted to use drugs, and his mother wanted to stop him. The ensuing rift between them led to her wanting him to leave her home. His response was to murder her, burn her body, dump her car and flee.

Generally, while any evidence which tends to show that an accused had a motive for committing murder is relevant, to be competent, it must at least to a slight degree tend to establish the existence of the motive relied on. *People v. Stewart*, 105 Ill. 2d 22, 56 (1984). To support its theory that defendant killed the victim because they were arguing about his drug use, the State presented evidence that, just prior to the murder and arson, the victim informed her sisters and defendant's girlfriend that she was upset by his behavior. She wanted him to get off drugs and into church, to get help, and move out of her home. Testimony that defendant characterized his mother as "tripping" and that he was depressed, lost his job, and took her money so he could get high gave the jury the necessary and minimum background information to understand the seriousness of the dispute and how it could escalate into murder. See *People v. Whalen*, 238 Ill. App. 3d 994, 1001-02 (1992) (where money was missing from the murder victim's safe and his son possessed a large amount of cash after the murder, additional evidence that the son used that money to buy and use cocaine was relevant and admissible to show the son's necessary attitude of desperation required to kill his father). There was a direct link between the proffered testimony and the motive for the murder. The State demonstrated that defendant's drug use was a source of friction between defendant and his mother, and the situation escalated just prior to the murder and arson.

Moreover, the evidence of defendant's drug use and theft was not overly detailed. The trial judge exercised his discretion to limit that testimony to the minimum necessary to give the jury a complete understanding of the State's evidence regarding defendant's motive for killing his mother. The trial court precluded testimony that defendant ransacked the victim's apartment searching for the money. The victim's sister was not allowed to elaborate on the kind of help the victim wanted to get for defendant. Moreover, there was no testimony about the type, amount or frequency of defendant's drug use or the amount of money he stole. Furthermore, the prosecution's reference during closing argument to defendant's drug use and theft was proper commentary upon the evidence presented. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). The State did not unfairly comment

upon or emphasize that evidence but, rather, discussed it as a relevant part of the argument between defendant and the victim to establish defendant's motive. Accordingly, the prejudice from that evidence did not substantially outweigh its probative value. We find no abuse of discretion in the admission of the drug use and theft testimony.

Defendant's reliance on *People v. Maounis*, 309 Ill. App. 3d 155 (1999), is misplaced. In *Maounis*, the defendant was convicted of armed robbery in that he pointed a gun at a business employee and took all the money from the cash register. *Maounis*, 309 Ill. App. 3d at 157. At trial, the State presented a detective's testimony that the defendant said he was staying in various transient hotels with a prostitute buying alcohol and smoking crack cocaine. *Maounis*, 309 Ill. App. 3d at 157. The trial court instructed the jury that the testimony was allowed for the limited purpose of showing motive. *Maounis*, 309 Ill. App. 3d at 157. The defendant testified and denied making the statement attributed to him by the detective. The defense also presented evidence that the defendant cashed several paychecks periodically during the relevant time period and, thus, had no reason to steal. *Maounis*, 309 Ill. App. 3d at 158. This court ruled that admission of the other-crimes evidence to show motive was error where the evidence established that the defendant had sufficient resources before and after the robbery, and no evidence indicated he suffered from any addiction. *Maounis*, 309 Ill. App. 3d at 160.

*Maounis* has limited applicability to the instant appeal. In *Maounis*, evidence of the defendant's purchase and consumption of alcohol and crack cocaine and patronization of a prostitute was used to show his motive to rob the business. Here, in contrast, evidence of defendant's drug use and theft was used to explain the basis of the argument between defendant and his mother that escalated into murder and arson. Moreover, in *Maounis*, the evidence refuted the State's claim that the defendant needed money to fund his partying, and it never indicated that he suffered from any addiction. Here, in contrast, the evidence established that defendant attended Narcotics Anonymous meetings, was depressed, borrowed money from the girlfriend he met at Narcotics Anonymous, lost his job, was living with his mother, and took her money so that he could get high. Whereas the other-crimes evidence in *Maounis* was too speculative to show motive and was outweighed by its prejudicial effect, here, defendant's drug use and theft were directly linked to the dispute with the victim that escalated into violence.

Similarly misplaced is defendant's reliance on *People v. Klimawicze*, 352 Ill. App. 3d 13, 17-18 (2004), where the defendant murdered her mother and the codefendant admitted that he used money the

defendant found in the victim's apartment to buy heroin. At trial, the State improperly asked the defendant's father if he knew the offenders would go to the projects to buy narcotics. *Klimawicze*, 352 Ill. App. 3d at 27. The State also improperly asked the defendant if she was using her public aid money to buy drugs. *Klimawicze*, 352 Ill. App. 3d at 27. Citing *Maounis*, this court rejected the State's argument that the questions were proper to establish the defendant's motive, *i.e.*, she killed her mother because she needed money to buy drugs. *Klimawicze*, 352 Ill. App. 3d at 27. Because the State had already offered evidence that the defendant used the victim's money to buy drugs, the question about her use of public aid money to buy drugs was more unfairly prejudicial than probative. *Klimawicze*, 352 Ill. App. 3d at 27. As discussed above, admission of the other-crimes evidence in the instant case does not conflict with the ruling in *Maounis*. Furthermore, *Klimawicze* did not hold that the testimony concerning the defendant's use of the victim's money to buy drugs was improperly admitted into evidence.

### 2. *Burglary and the Stolen Truck*

■ Defendant contends the trial court abused its discretion by allowing evidence concerning his burglary of Flash Trucking and theft of a truck. The State argues the evidence was admissible to establish defendant's identity as the murderer and arsonist, his consciousness of guilt, his overarching plan to get away with the murder of his mother, and to explain his arrest in Springfield.

When the trial court severed the charges of burglary, truck theft and possession of burglary tools from the murder/arson trial, the court precluded evidence of defendant's forced entry at Flash Trucking and possession of burglary tools but reserved ruling on whether someone from Flash Trucking could testify regarding whether defendant had permission to take the Flash Trucking property. At trial, only Tim Long, a Flash Trucking manager, testified that defendant did not have permission to take the Flash property and referred to the truck as "stolen." After the jury heard the testimony concerning the Flash Trucking theft and unlawful restraint of Dixon, the court instructed the jury to consider the other-crimes evidence for the limited purposes of defendant's design and the circumstances surrounding his arrest. We find the trial court did not abuse its discretion in admitting evidence that defendant stole Flash Trucking's property and a truck.

The evidence concerning the Flash Trucking theft was admissible because it was inextricably intertwined with evidence identifying defendant as the murderer and arsonist. *People v. Jackson*, 304 Ill. App. 3d 883, 896 (1999) (evidence of other crimes is admissible if it is

intertwined with the instant offense or relates to the events which occurred earlier in the evening which led to the charged offense); *People v. Lewis*, 243 Ill. App. 3d 618, 625-26 (1993). Specifically, no one saw the victim after Saturday and defendant lied about her whereabouts on Sunday and Monday and was in possession of her car; on Monday night, a smoke detector alarm was triggered and removed from the victim's residence; the landlord saw defendant leave the victim's apartment with something tucked under his arm shortly before the fire was discovered; the victim's car containing the smoke detector was abandoned at Flash Trucking, where defendant was formerly employed; fuel and tollway cards, keys and a truck were missing from Flash Trucking; defendant's wallet-sized photographs and identification were recovered at the scene of the Flash Trucking theft; and defendant parked the missing truck in front of Dixon's house shortly before his arrest. See *People v. Mikka*, ; Ill. 2d 454, 461-62 (1955) (in a prosecution for armed robbery of a tavern, evidence that defendants in a speeding car fired a gun at another motorist was admissible to show consciousness of guilt and to connect defendant to the getaway car and gun).

The truck theft evidence was also admissible as inextricably intertwined with evidence establishing defendant's consciousness of guilt and attempts to avoid apprehension. *People v. Lenhardt*, 340 Ill. 538, 545-46 (1930); *People v. Aleman*, 313 Ill. App. 3d 51, 64-65 (2000). Specifically, defendant tried to conceal the murder through arson, fled the Chicago crime scene, abandoned the victim's readily identifiable car by exchanging it for a truck, and drove the truck to Springfield. The theft also contradicted defendant's explanation to Dixon that he was validly in possession of the truck and on layover from work.

In addition, the truck theft was admissible to explain the circumstances of defendant's arrest in Springfield. *People v. Coleman*, 158 Ill. 2d 319, 336 (1994); *People v. Young*, 118 Ill. App. 3d 803, 809 (1983); *People v. Robinson*, 98 Ill. App. 2d 285, 288-89 (1968). The stolen truck and tollway and fuel cards explained to the jury how defendant left Chicago in the victim's car after he committed the murder and arson and then resisted arrest in Springfield several hours later. The trial court properly instructed the jury to consider the other-crimes evidence for this limited purpose.

We also agree with the trial court's instruction that the truck theft was admissible as part of defendant's design. A common design or scheme refers to a larger criminal scheme of which the crime charged is only a portion. *People v. Jones*, 156 Ill. 2d 225, 239 (1993). The several crimes must have some degree of identity between the facts of the crime charged and those of the other offense in which the

defendant was involved. *Jones*, 156 Ill. 2d at 239. The common design or scheme "refers to the notion of a series of crimes, wrongs, or acts employed usually to establish identity *** with respect to the crime for which the accused is on trial, such as identification of the accused as having stolen the gun used in a shooting." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 404.5, at 203 (8th ed. 2004). In such instances, similarity between the charged crime and other crime is not always required. The common design or scheme requires that the other crime, wrong or act itself be part of one larger crime or a larger criminal scheme, and not be solely an independent although similar crime. What must be established is a coherent pattern of connected behavior. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 404.5, at 203-04 (8th ed. 2004).

The truck theft was connected to defendant's scheme to conceal the murder and avoid apprehension by attempting to establish an alibi, burning the victim's apartment, and fleeing Chicago. See *People v. Willis*, 119 Ill. App. 3d 34, 40 (1983) (other crime of siphoning gas was admissible in armed robbery prosecution where both offenses were connected by a common purpose—to obtain gas for a trip). The evidence indicated that the victim was murdered in her apartment either late Saturday or early Sunday and defendant attempted to conceal the crime. Specifically, he lied about the victim's whereabouts, saying she went shopping on Sunday and to work on Monday. Before defendant set the fire to conceal the crime, he visited Burage to attempt to set up an alibi. Then, defendant returned to the victim's apartment, set the fire and fled Chicago, exchanging the victim's car for his former employer's truck. After his apprehension, defendant attempted to convince Burage that he was at her home when the landlord discovered the fire and summoned the fire department. See *Jackson*, 304 Ill. App. 3d at 896 (defendant's actions constituted a continuing and related course of criminal conduct where he stabbed the victim, took the victim's property, fled the scene in the victim's car, and sold or loaned the victim's property within a few hours of the stabbing).

Even if the truck theft was not admissible under the common scheme or design exception, the inclusion in the jury's limiting instruction of a proper exception (circumstances surrounding defendant's arrest) requires us to affirm defendant's conviction. *Spyres*, 359 Ill. App. 3d at 1115. Our supreme court has held that "[w]hen jurors receive a limiting instruction that permits them to consider evidence for a number of reasons, and one of those reasons is determined on appeal to be improper, judgment of conviction must be affirmed despite the overly broad instruction." *Jones*, 156 Ill. 2d at 240.

### 3. *Defendant's Parole Status*

■ Defendant contends the trial court erred by allowing the State to present evidence of his parole status through Rachel Dixon and Officer Mendenhall. We disagree. The record establishes that the defense opened the door to Dixon's testimony concerning defendant's statements about his parole violation, and the State did not elicit any improper testimony from Officer Mendenhall.

Prior to trial, the court granted the State's motion *in limine* to admit evidence surrounding defendant's arrest, specifically his resistance to arrest, to show his guilty frame of mind. *People v. Wilson*, 257 Ill. App. 3d 826, 831 (1994) (arresting officer's testimony that the defendant took a woman hostage when the police tried to arrest him was admissible to show the circumstances of his arrest). At the hearing on the motion, the prosecutor explained that he did not intend to introduce any evidence concerning defendant's parole status, parole violation, or the sexual assault. At trial during Dixon's direct examination, her testimony concerning defendant's arrest and the standoff with police at her home fully complied with the State's representations when seeking the motion *in limine*. However, during Dixon's cross-examination, the defense elicited testimony that implied defendant did not know why a person would come to the door and point a gun at him and that he called the police for protection. The trial court properly determined that the defense opened the door for the admission of evidence showing why defendant actually slammed the door shut. *People v. Medina*, 239 Ill. App. 3d 871, 880 (1993) (other-crimes evidence may be admitted on redirect where cross-examination raises an inference that the other-crimes evidence contradicts). Accordingly, to rebut the defense's suggestion that defendant's reaction to Officer Mendenhall had an innocent explanation, on redirect the State elicited testimony from Dixon that defendant said Mendenhall was after him for a parole violation. The defense placed defendant's state of mind at issue, so his statements to Dixon were relevant to show his consciousness of guilt. The probative value of the limited parole evidence outweighed its prejudicial nature in light of defense counsel's cross-examination.

Mendenhall testified *after* the defense opened the door to Dixon's testimony at issue on appeal. Mendenhall testified only about his job duties as an internal security investigator with the Illinois Department of Corrections and that he was looking for defendant and Dixon. Mendenhall did not testify or imply that he was defendant's parole officer or that he was looking for defendant for a routine parole investigation or parole violation or because defendant was wanted on a murder case. Mendenhall's limited testimony was not prejudicial

because it was merely cumulative of the properly admitted testimony that defendant told Dixon Mendenhall was a parole officer from the Department of Corrections. *People v. Casillas*, 195 Ill. 2d 461, 483 (2000). The fact that Mendenhall was a parole officer added nothing new to the information already before the jury, and the trial court did not abuse its discretion by allowing this evidence.

### 4. *Probative Value and Prejudicial Impact*

■ Although the other-crimes evidence had a prejudicial impact, we agree with the trial court that the evidence's probative value outweighed this prejudicial impact. The trial court was in the best position to weigh the prejudicial impact of this evidence versus its probative value in proving that defendant's argument with his mother escalated to murder and he tried to construct an alibi, attempted to conceal the crime by arson, fled Chicago in the victim's car and then continued his flight after he exchanged the car for the truck. The other-crimes evidence was intertwined, would have been confusing and out of context had it been presented in piecemeal fashion, and was limited to that which was relevant for the purposes for which it was introduced. Reviewing the court's decision under the appropriate standard, we conclude that the court did not abuse its discretion. See *Wilson*, 214 Ill. 2d at 136; *Spyres*, 359 Ill. App. 3d at 1114-15.

### B. Closing Argument

■ Defendant also contends the State made improper comments in closing argument that minimized the State's burden of proof. Defendant argues the prejudicial comments denied him a fair trial.

Comments made in closing argument must be considered in context by examining the entire closing arguments of both the State and the defendant. *People v. Kliner*, 185 Ill. 2d 81, 154 (1998). It is well established that the State is given wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence. *Kliner*, 185 Ill. 2d at 151. Further, the State may respond to comments by defense counsel that clearly invite a response. *Kliner*, 185 Ill. 2d at 154. "The trial court has discretion to determine the proper character, scope and prejudicial effect of closing arguments." *Kliner*, 185 Ill. 2d at 151. "Improper remarks warrant reversal only where they result in substantial prejudice to the defendant, considering the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *Kliner*, 185 Ill. 2d at 152. We find that the complained-of comments were not error, did not result in substantial prejudice to defendant and were not a material factor in his conviction.

Defendant contends the prosecutor minimized the State's burden

of proof by arguing that reasonable doubt has been the standard in criminal cases for over 100 years and is the same burden in every single criminal case in all 36 courtrooms in the building, 5 suburban districts, 103 counties in Illinois, and 50 states in the country. When the prosecutor stated that the "jail is filled with people where we've met that burden," the trial court sustained defendant's objection.

Defendant was not denied a fair trial where our supreme court has ruled that similar comments, *i.e.*, that the standard of reasonable doubt was not an unreasonable burden and was met every day in courtrooms here and across the country, were within the proper bounds of argument. *People v. Kidd*, 175 Ill. 2d 1, 40 (1996); *People v. Moore*, 171 Ill. 2d 74, 104 (1996); *People v. Harris*, 129 Ill. 2d 123, 161 (1989); *People v. Gacho*, 122 Ill. 2d 221, 255 (1988); *People v. Collins*, 106 Ill. 2d 237, 277 (1985); *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983). Contrary to defendant's assertions, the record establishes that the prosecutor did not attempt to define the reasonable doubt standard to the jury. Moreover, the trial court properly sustained defense counsel's objection to the irrelevant statement about the State meeting its burden of proof in criminal cases against other defendants.

We perceive no misconduct on the part of the prosecutor and do not find that the irrelevant comment resulted in substantial prejudice to defendant where the trial court promptly sustained the objection, instructed the jury that arguments were not part of the evidence and should not be considered as such, and instructed the jury to disregard any argument not based on the evidence.

### C. Jury Waiver for Extended-Term Sentencing Issue

■ Defendant contends the trial court improperly applied the *Apprendi* rule that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Defendant contends the trial court erred when it denied his request to bifurcate the trial to allow the jury to determine the issue of guilt but the trial judge to determine the extended-term sentencing issue, *i.e.*, whether defendant committed the murder in a brutal and heinous manner indicative of wanton cruelty. We disagree.

The wanton cruelty, extended-term sentencing issue must be submitted to the fact finder and proved beyond a reasonable doubt as required by *Apprendi*. *People v. Swift*, 202 Ill. 2d 378, 391 (2002); *People v. Lee*, 342 Ill. App. 3d 37, 56-57 (2003). However, no statutory right to a bifurcated hearing separating the issues of guilt and wanton cruelty between different fact finders exists under Illinois law, and *Apprendi* and its progeny do not create such a right.

Defendant's reliance on *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), to support his argument for a bifurcated jury and bench trial is misplaced. In *Blakely*, where the defendant pled guilty to second degree kidnapping involving domestic violence and the use of a firearm, the United States Supreme Court applied the principle set forth in *Apprendi* to the State of Washington's determinate sentencing scheme. Although the State classified second degree kidnapping as a Class B felony, which carried a maximum penalty of 10 years' incarceration, the State's sentencing guidelines for the conduct admitted as part of the guilty plea carried a maximum of only 53 months. The question presented was whether the statutory maximum for *Apprendi* purposes was 10 years or 53 months. The Supreme Court held that 53 months was the relevant maximum, because that was the maximum sentence the judge could have imposed without finding any facts beyond those admitted in the guilty plea. *Blakely*, 542 U.S. at 303-04, 159 L. Ed. 2d at 413-14, 124 S. Ct. at 2537-38.

Addressing the argument that *Apprendi* works to the detriment of criminal defendants who plead guilty by depriving them of the opportunity to argue sentencing factors to a judge, the *Blakely* Court responded that "[i]f appropriate waivers are procured, States *may* continue to offer judicial factfinding as a matter of course to all defendants who plead guilty." (Emphasis added.) *Blakely*, 542 U.S. at 310, 159 L. Ed. 2d at 418, 124 S. Ct. at 2541. However, "States are not *required* to give defendants the option of waiving jury trial on some elements but not others." (Emphasis in original.) *Blakely*, 542 U.S. at 310 n.12, 159 L. Ed. 2d at 418 n.12, 124 S. Ct. at 2541 n.12. We find that the Illinois statutes codifying the principles of *Apprendi* in extended-term sentencing situations do not give defendants the option to bifurcate the issues of guilt and wanton cruelty or to have those issues decided by different fact finders.

The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *In re B.C.*, 176 Ill. 2d 536, 542 (1997). The best indication of legislative intent is the language of the statute. *In re B.L.S.*, 202 Ill. 2d 510, 515 (2002). The language of the statute must be given its plain and ordinary meaning. *People v. Moore*, 69 Ill. 2d 520, 523 (1978). If the language of the statute is clear and unambiguous, there is no need to resort to other aids of construction. *In re B.L.S.*, 202 Ill. 2d at 515. Issues of statutory construction are reviewed *de novo. In re B.L.S.*, 202 Ill. 2d at 514.

Regarding the required form of criminal charges, section 111—3(c—5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(c—5) (West 2004)) provides:

"Notwithstanding any other provision of law, in all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt."

Similarly, section 5—8—2(a) of the Unified Code of Corrections (hereinafter Unified Code) (730 ILCS 5/5—8—2(a) (West 2004)) provides, in pertinent part, that a judge may sentence the defendant to an extended term if the factors in aggravation set forth in subsection (a)(1)(b) of section 5—8—1 of the Unified Code (730 ILCS 5/5—8—1(a)(1)(b) (West 2004)) were found to be present—*i.e.*, "if a trier of fact finds beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

The language of the statutes evidences the legislative intent to have a single trier of fact determine both the presence of the elements of the underlying offense and the facts that increase a convicted defendant's sentence above the statutory maximum. The statutes do not authorize a bifurcated proceeding where the defendant may demand a jury trial on the issue of guilt and also choose that either a jury or the judge will thereafter determine whether the offense was committed in an exceptionally brutal or heinous manner. In extended-term sentencing situations,[1] the Illinois legislature did not provide for a bifurcated proceeding similar to the separate sentencing hearing in death penalty cases. See 720 ILCS 5/9—1(d) (West 2004).

---

[1]In contrast to situations involving extended-term sentences, legislation has been enacted in situations involving enhanced sentences to keep prejudicial facts concerning the defendants' prior convictions from being disclosed to the jury during the trial. Specifically, in *People v. Hicks*, 119 Ill. 2d 29, 30-31 (1987), our supreme court held that evidence of the defendant's prior theft conviction, which elevated an otherwise misdemeanor theft charge to a felony, needed to be proven to the jury during the evidentiary phase of the trial. As noted in *People v. Williams*, 191 Ill. App. 3d 119, 120 (1989), the *Hicks* ruling was superseded by statute, which provides that when the State seeks an enhanced sentence, *i.e.*, a sentence that is increased by a prior conviction from one classification of offense to another higher level classification of offense, the fact of the prior conviction is not an element of the offense and may not be disclosed to the jury during trial unless otherwise permitted by issues properly raised during such trial. 725 ILCS 5/111—3(c) (West 2004).

Furthermore, Illinois case law does not authorize a bifurcated trial separating proof of the extended-term aggravating factor from the finding of guilt. *People v. Forcum*, 344 Ill. App. 3d 427, 439 (2003) (rejecting defendant's argument that the wanton cruelty, extended-term sentencing issue could have been submitted to the jury in a bifurcated approach after the defendant had been found guilty of murder). See also *People ex rel. Carey v. Pincham*, 76 Ill. 2d 478, 479-80 (1979) (where defendant was charged with unlawful use of a weapon within five years of a release from prison on a felony charge, the trial court could not bifurcate the trial to have the jury determine guilt first and then consider proof of aggravating circumstances); *People v. White*, 241 Ill. App. 3d 291, 301 (1993) (applying the *Hicks* rationale to hold that the State must prove to the jury beyond a reasonable doubt during the evidentiary phase of the trial the fact that the victim was over 60 years of age to raise the degree of the robbery conviction from a Class 2 felony to a Class 1). The trial court properly denied defendant's motion for a bifurcated jury trial on the issue of guilt and bench trial on the issue of wanton cruelty.

Accordingly, we affirm the judgment of the trial court.

Affirmed.

McNULTY, P.J., and O'MALLEY, J., concur.