# Illinois Official Reports

## Appellate Court

*People v. Baker*, 2015 IL App (5th) 110492

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLIFFORD W. BAKER, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-11-0492 |
| Filed | February 6, 2015 |
| Modified upon denial of rehearing | March 17, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a 15-year-old defendant's convictions for three counts of home invasion, two counts of first degree murder and his sentences to two mandatory terms of natural life in prison for the murders and 30 years for each of the home invasions and one 30-year term consecutive to the sentences on all other counts after he was tried as an adult pursuant to the automatic transfer provision in the Juvenile Court Act, the appellate court, *inter alia*, vacated the mandatory natural life sentences and remanded the cause to the trial court for a new sentencing hearing to determine which of the home invasion charges was the less serious offense and to vacate the less serious conviction and sentence and correct the sentencing order. |
| Decision Under Review | Appeal from the Circuit Court of Fayette County, No. 10-CF-130; the Hon. Michael D. McHaney, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with instructions. |

Counsel on
Appeal

Michael J. Pelletier, Ellen J. Curry, Michelle Zalisko, and Amanda R. Horner, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Joshua Morrison, State's Attorney, of Vandalia (Patrick Delfino, Stephen E. Norris, and Jennifer Camden, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Stewart and Moore[*] concurred in the judgment and opinion.

**OPINION**

### I. INTRODUCTION

¶ 2        Following a jury trial, the defendant, Clifford W. Baker, was convicted of two counts of first degree murder and three counts of home invasion. He was sentenced to two mandatory terms of natural life in prison for the murders, and a term of 30 years for each of the home invasions, with one 30-year term to run consecutive to the sentences on all other counts. Although the defendant was 15 years old at the time he committed the murders, he was tried as an adult in accordance with the automatic transfer provision in the Illinois Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-130(1)(a) (West 2010)). On appeal, the defendant challenged the constitutionality of the automatic transfer provision, the constitutionality of the sentencing scheme as applied to juvenile defendants, the propriety of certain procedural and evidentiary rulings by the trial court, and the effectiveness of his trial counsel. Our original opinion was issued on February 6, 2015. The defendant filed a petition for rehearing on February 27, 2015. We now issue this modified opinion upon denial of the defendant's petition for rehearing. For the reasons stated, the defendant's mandatory natural life sentences for murder must be vacated and the cause must be remanded for a new sentencing hearing. We affirm in part, vacate in part, and remand with instructions.

### II. FACTUAL BACKGROUND

¶ 4        On August 5, 2010, the 15-year-old defendant was charged by information with two counts of first degree murder, under section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 2010)). The charges arose from the shooting deaths of John Michael "Mike" Mahon and Debra H. Tish at their home in Farina, Illinois, on August 4, 2010. Count I alleged that the defendant shot Mike Mahon with a rifle, without lawful

---

[*]Justice Spomer was originally assigned to participate in this case. Justice Moore was substituted on the panel subsequent to Justice Spomer's retirement and has read the briefs and listened to the tape of oral argument.

justification and with intent to kill him. Count II alleged that the defendant shot Debra Tish with a rifle, without lawful justification and with intent to kill her. The charges were filed in the circuit court pursuant to the automatic transfer provision in the Juvenile Court Act (705 ILCS 405/5-130(1)(a) (West 2010)).

¶ 5 On August 9, 2010, the State filed two additional counts of first degree murder arising from the deaths of Mike Mahon (count III) and Debra Tish (count IV), but those counts were voluntarily dismissed before the case was given to the jury. The State also filed two counts of home invasion under section 12-11(a)(5) of the Code (720 ILCS 5/12-11(a)(5) (West 2010)). Count V alleged that the defendant knowingly and without authority entered the Mahon-Tish home and intentionally caused injury to Mike Mahon. Count VI was identical to count V, but alleged injury to Debra Tish. In December 2010, the State added another count of home invasion (count VII) under section 12-11(a)(2) of the Code (720 ILCS 5/12-11(a)(2) (West 2010)). Count VII alleged that on August 4, 2010, the defendant knowingly and without authority entered the home of Steve Krajefska and Randy Krajefska and intentionally caused injury to Randy Krajefska.

¶ 6 A. The Commission of the Offenses

¶ 7 The basic facts regarding the offenses and the identity of the person who committed them were not disputed at trial. The primary issues in dispute were the defendant's mental capacity at the time he committed the offenses and the voluntariness of his confession. An overview of the evidence follows.

¶ 8 On August 4, 2010, at approximately 3:30 a.m., Steve Krajefska and his wife, Randy Krajefska, were awakened when someone walked through their bedroom and went into a bedroom closet. Randy switched on her bedside light and walked to the closet. When she was near the closet door, the intruder jumped up, punched her in the jaw, and cut her above her eyebrow with a knife. Randy, dazed by the attack, ran into the bathroom. As Steve stood on the opposite side of the bed, he recognized the intruder as the defendant, a teenager who lived in the neighborhood. The defendant, barefoot and clad only in shorts, was hunched over, as if in "attack mode." He was holding a butcher knife. Steve ordered the defendant to drop the knife. The defendant lunged toward Steve and swiped at him with the knife, but missed the target. The defendant then exited the bedroom and ran from the house.

¶ 9 Steve called 911 immediately after the defendant left. While Steve was on the phone with the 911 operator, Randy noticed that the lights were on in the house of their next-door neighbors, Mike Mahon and Debra Tish, so she phoned them. No one answered. As Randy and Steve waited for the police, they saw the defendant walking down the road behind the home of Mike Mahon and Debra Tish and toward his own home. He was screaming. Steve described the scream as high-pitched, "like a woman" would make. Randy thought it sounded like a "war whoop."

¶ 10 Two Fayette County sheriff's deputies, Steven Coody and Josh Wattles, were dispatched to investigate the reported home invasion at the residence of Steve and Randy Krajefska, in Loogootee, Illinois. Deputy Coody and Deputy Wattles were just outside Loogootee, when they were notified that the defendant had left the Krajefska residence and was last seen walking toward his home. They drove directly to the defendant's home. When Deputy Coody pulled into the driveway, he observed the defendant and the defendant's father standing inside the garage, yelling at each other. The defendant had a manual staple gun, and he was

attempting to shoot staples into his neck and chest. As Deputy Coody approached the garage, the defendant pointed the staple gun at him. The defendant was grunting or growling and acting out of control. The defendant's father grappled with the defendant and snatched the staple gun from him. Deputy Coody then ordered the defendant to come out and place his hands on the patrol car. The defendant did not comply. He continued to yell as he walked away. Deputy Coody ordered the defendant to turn around and place his hands on the patrol car. The defendant continued to walk the other way. Deputy Coody pulled out his Taser and fired, hitting the defendant in the back with a five-second burst. The defendant fell to the ground. He was handcuffed without a struggle. The deputies helped him to his feet and then conducted a pat-down search. They recovered a cigarette lighter, rolling papers, a bottle of "nitro" pills, and a cell phone. Deputy Coody called for an ambulance. He thought the defendant should be medically evaluated after being tasered.

¶ 11    Moments after the defendant was apprehended, Steve Krajefska came up to Deputy Coody and stated that he was concerned about his neighbors, Mike Mahon and Debra Tish. Deputy Coody walked around the Mahon-Tish residence. He noted that the back door was open and that the lights were on inside. He knocked on the door and announced his presence. When he received no response, he entered the house. He walked into the kitchen and saw two rifles lying on the kitchen table. He then entered the living room. He observed two people, partially covered with a sheet, lying on the mattress. As he stepped closer, he observed that both had severe head wounds. It appeared that they had been shot multiple times and that they were dead. Deputy Coody searched the rest of the house but found no one else inside. He advised Deputy Wattles of the situation and then asked the dispatcher to notify the sheriff, the coroner, and the investigations unit. Deputy Coody and Deputy Wattles secured the scene and awaited the arrival of the Illinois State Police investigators. The deceased victims were later identified as Mike Mahon and Debra Tish.

¶ 12    In the meantime, an ambulance arrived. Deputy Coody escorted the defendant to the ambulance. Once the defendant was situated inside, he was given *Miranda* warnings by Deputy Coody. Medics evaluated the defendant and then transported him to Fayette County Hospital. Trooper Stacey Heselton, a certified juvenile officer with the Illinois State Police, accompanied the defendant to the hospital. Trooper Heselton recalled that during the ride to the hospital, the defendant seemed to be confused, agitated, and talkative, but he was able to respond appropriately to the questions from the medics. The defendant told the medics that he had taken six Cymbalta tablets and some other pills, and that he had consumed beer and some other drink earlier that night. Trooper Heselton remained with the defendant at the hospital. He testified that he told the defendant that he was a juvenile officer. He recalled that he had to remind the defendant about his *Miranda* rights at one point when the defendant started to blurt out incriminating statements to the medical personnel who were caring for him. Aside from that, he did not initiate any conversations with the defendant, and he did not question the defendant.

¶ 13                    B. The Defendant's Recorded Statement

¶ 14    Special Agent Albert Gallatin, a State Police officer, arrived at the crime scene at approximately 5:45 a.m. While at the scene, he spoke briefly with the defendant's father, Jeff Goldman. Lieutenant Tom Oliverio, Agent Holly Stroud, and Jeff Goldman's girlfriend, Justina Fryman, were present during the conversation. Agent Gallatin told Mr. Goldman that

- 4 -

the defendant had been taken to Fayette County Hospital. Agent Gallatin testified that he asked Mr. Goldman for permission to speak with the defendant to find out what had happened and that Mr. Goldman consented. Agent Gallatin stated that Mr. Goldman gave no indication that he wanted to be present during the interview. Agent Stroud corroborated Agent Gallatin's testimony.

¶ 15    Agent Gallatin and Agent Stroud left the scene and went to the hospital. Agent Stroud attended in her capacity as a juvenile officer. Trooper Heselton met Agent Gallatin and Agent Stroud in the hallway outside the defendant's room. He advised them that he was a juvenile officer, that he had accompanied the defendant on the ride to the hospital, and that he had been with him since they arrived. He also advised them that the hospital personnel had removed the defendant's shorts and found a small bag of cannabis in one of the pockets.

¶ 16    Agent Gallatin testified that when he entered the defendant's room, he observed that the defendant was handcuffed to the bedrails and was sleeping. Agent Gallatin set up a video camera. He then woke the defendant and asked if it would be okay to videotape him. The defendant agreed. Agent Gallatin started the recorder. He then informed the defendant that he had spoken with the defendant's father and that he had received permission to interview the defendant. Agent Gallatin then asked the defendant if he would agree to a recorded interview, and the defendant agreed. The interview began at approximately 7:18 a.m. and ran approximately 48 minutes. Agent Stroud and Trooper Heselton were present during the interview. They did not ask any questions and they did not take part in the investigation. By all accounts, there was no preinterview questioning or discussion.

¶ 17    The video shows that Agent Gallatin gave *Miranda* warnings to the defendant before asking any questions. Agent Gallatin read each warning and, after each, asked the defendant if he understood it. The defendant indicated that he understood each warning. He also signed a written form. The defendant appeared to be drowsy at the start of the interview, but he seemed to understand the process and his answers were responsive to the questions posed.

¶ 18    The defendant told Agent Gallatin that he and his dad got into an argument on the evening of August 3, 2010, and that he took some of his dad's beer from the refrigerator and went to the garage to drink it. As he was drinking the beer, he exchanged text messages with Kelly Lange, a girl he met on a social media site. He then walked over to Mike Mahon's garage and took a container of vodka from the refrigerator. He started to drink the vodka, but it was spicy and made him sick, so he threw it into the garden. The defendant then took some marijuana and some pills out of a drawer near the refrigerator. He went back to his garage and smoked the marijuana. The defendant returned to Mike Mahon's home. This time, he went inside. He entered through the back door. The defendant stated that he found a rifle in the kitchen. He tried to shoot himself in the head with the gun, but it would not fire. He then lit a cigarette and threw it into the trash can. The defendant stated that the cigarette started a fire in the trash can and that the fire caused the smoke alarm to go off. The defendant said that Deb and Mike were asleep in another room and that Deb woke up when the smoke alarm sounded. The defendant feared that he would get in trouble for breaking into someone's house, so he shot Deb first, and then he shot Mike. He put the gun on the kitchen table and left the house. The defendant said that he was then confronted by Randy Krajefska. He had a knife that he had taken from Mike's house. He was unsure if he stabbed Randy with the knife. He tossed the knife into a field near his house.

¶ 19                                    C. The Investigation

¶ 20        Investigators recovered records of the defendant's phone calls and text messages from the night of the murders, and they interviewed Kelly Lange. Ms. Lange testified that she met the defendant on a social networking site for the first time during the week prior to the shootings. She had never met the defendant in person. The text messages that the two exchanged were presented at trial. In one of his texts, the defendant wrote that he felt weird and that he felt he was going to do something bad.

¶ 21        Crime scene technicians searched the Mahon-Tish residence. They found a military-style rifle and a .22-caliber rifle in the kitchen. They discovered that the smoke alarm in the kitchen had been damaged, but they found no evidence of a fire in the kitchen trash can or anywhere else. The knife that was used in the attack on Randy Krajefska was located in a field near the defendant's home. Some blood found on the defendant's shorts was tested and matched the DNA of Mike Mahon. Blood and urine samples were collected from the defendant at the hospital. The urinalysis revealed that the defendant had an alcohol level of 0.118 and that he had marijuana in his system.

¶ 22        At the time of these events, Justina Fryman and her son lived with the defendant's father and the defendant. Justina testified that she had taken her son and the defendant to the pool on the afternoon of August 3, 2010. After leaving the pool, she made dinner for the boys. Jeff Goldman got home from work about 6 p.m. He had a few beers and then went to mow a neighbor's lawn. Justina recalled that at approximately 9 p.m., she, Jeff, and the two boys gathered together to watch a movie. The movie was two hours long. When the movie ended, the boys went to their bedrooms, and she and Jeff went to sleep in their bedroom. At approximately 2:45 a.m., the defendant entered the bedroom where she and Jeff were sleeping. He complained that he did not feel right and that he was hot. Jeff told the defendant to lie down in the cool air in the bedroom. She and Jeff fell asleep. The defendant woke them again at about 3:45 a.m. He was talking "gibberish" and waving his arms. Justina did not know whether the defendant was dreaming or had overdosed. The defendant said, "I killed them. The whole world's dead." He then fell down on the floor. He was banging his head and flopping. It looked like he was having a convulsion. Justina went into the kitchen to see if the defendant had gotten into his prescription medication. She counted the pills and noted that six were missing.

¶ 23        When Justina returned to the bedroom, the defendant was smoking a cigarette and cussing. Justina noted that the defendant did not smoke or curse in front of them and that this was unusual behavior. Jeff took the cigarette away from the defendant and asked, "What's wrong with you, boy?" The defendant grabbed Jeff's hand and said, "Come on, I'll show you." The defendant led Jeff outside. The defendant began walking toward Mike Mahon's house. Jeff was standing near his garage and told the defendant to come back to the house. The defendant emitted a very high-pitched scream as he walked back toward the house. Just then, two sheriff's deputies pulled up. The defendant ran into the garage and grabbed a staple gun. He placed it near his neck and started to shoot himself with staples. Jeff grabbed the staple gun from the defendant. Justina noted that the defendant failed to comply with the deputy's orders and so he was tasered. Jeff Goldman's account of these events was similar to Justina's account, and so it will not be restated here.

¶ 24                          D. The Defendant's Mental Capacity

¶ 25        The defense team announced that it intended to present an insanity defense and an involuntary intoxication defense at trial. These affirmative defenses were based on the defense theory that the defendant suffered a psychotic event and became violent as a result of taking a prescription antidepressant called Cymbalta.

¶ 26        During the State's case, the defendant elicited testimony establishing that he had been hospitalized and diagnosed with major depression after he shot himself in the abdomen with a rifle on July 22, 2010, that Cymbalta had been prescribed for the depression, and that he had been taking the medication daily from July 23, 2010, through August 3, 2010. The State, over the defendant's objection, was then permitted to introduce evidence of events that surrounded the incident on July 22, 2010. The evidence showed that the defendant began drinking beer after a disagreement with his father over household chores. After drinking a few beers, the defendant broke into his uncle's house and took a .22-caliber rifle. He returned home and continued drinking. The family dog started to annoy him, so he shot it with the rifle. The defendant feared that he would get in trouble for killing the dog, so he dragged the dog's body onto nearby railroad tracks. He returned to his house, shot himself in the stomach with the rifle, and called 911. He reported that someone kicked in his door and shot him. Police responded and the defendant was taken to the hospital for treatment. When he was questioned at the hospital, he admitted that there was no intruder and that he shot himself. The defendant was transferred to a short-term psychiatric facility on July 23, 2010. He was diagnosed with major depression and prescribed an antidepressant called Cymbalta. The defendant was discharged on July 30, 2010, with instructions to continue taking the medication daily.

¶ 27        During the trial, the defense presented two expert witnesses in support of its affirmative defenses. Dr. Jonathon Lipman, a neuropharmacologist, testified about the reported adverse effects of Cymbalta on adolescents in general. Marcia Slomowitz, M.D., a child and adolescent psychiatrist, testified about her evaluation of the defendant and her opinions regarding his mental status at the time of the murders.

¶ 28        Dr. Slomowitz testified that she evaluated the defendant in March of 2011. She noted that the defendant had experienced depression and suicidal thoughts from a very young age and that he had been sexually abused by a man one time when he was a child. She noted that the defendant's mother left the family when the defendant was three years old and that he was raised by his grandmother and his father. She further noted that the defendant's grandmother died when he was 10 years old and that his depression deepened and his suicidal thoughts increased following her death. Dr. Slomowitz testified that the defendant began taking Cymbalta about two weeks prior to the murders. He reported that he did not like taking the medication because it made him feel too hyper and disrupted his sleep. Dr. Slomowitz noted that the defendant experienced agitation, vivid homicidal night terrors, akathisia, and hypomania while taking the medication. She explained that akathisia is characterized by an internal restlessness and distress which can increase suicidality and violent behavior, and that hypomania is characterized by talking too fast, irritability, and hostility.

¶ 29        Dr. Slomowitz testified that Cymbalta carries a "black box" warning of potential adverse effects. She explained that the warnings are issued by the Food and Drug Administration (FDA), and that "black box" warnings are the highest level warnings issued before a drug is taken off the market. Dr. Slomowitz testified that the "black box" warnings state, in part, that

- 7 -

there is an increased risk of suicide or violent behavior in persons under age 24 who take Cymbalta. Dr. Slomowitz opined that at the time of the murders, the defendant was suffering from the adverse effects of Cymbalta, that he lacked the capacity to understand right from wrong as a result of the adverse effects of the Cymbalta, and that the defendant did not understand or have the capacity to appreciate the criminality of his conduct in August 2010.

¶ 30 During cross-examination, Dr. Slomowitz acknowledged that the "black box" warnings do not mention an increased risk of violence associated with adolescents taking Cymbalta. She stated that the increased risk of violence in younger people who take Cymbalta is reported in other studies in the literature. Dr. Slomowitz was unable to recall the names of the studies at trial. She acknowledged that she had not included those references in her written report. Dr. Slomowitz opined that the defendant was out of touch with reality at the time of the crimes, and she based her opinion, in part, on the observations of the defendant's behavior that night, including Steve Krajefska's description of the defendant, crouched in attack mode, and the observations of the witnesses who saw the defendant's attempts to shoot himself and the deputies with a staple gun. Dr. Slomowitz stated that the defendant's psychotic episode began sometime after the defendant took the first dose of Cymbalta and ended when he stopped taking it, but she could not provide a more specific time frame.

¶ 31 Dr. Slomowitz acknowledged that she issued a preliminary report in which she opined that the defendant understood the criminality of his conduct when he killed the second victim. She testified that she did not have all of the police reports and witnesses' statements when she wrote the preliminary report and that she modified her opinions after reviewing that information. Dr. Slomowitz testified that she did not believe the defendant was psychotic on July 22, 2010, when he killed his dog and shot himself. She based this opinion on the defendant's ability to provide a clear recitation of that event and on the lack of any documentation of psychosis in his medical records following that event. Dr. Slomowitz then testified that the defendant's psychosis was caused by the drug along with all the other intoxicants he ingested on the night of the murders.

¶ 32 The State called Dr. Ashok Yanamadala as a rebuttal witness. Dr. Yanamadala is a psychiatrist, and he was a member of the team that treated the defendant at the Gateway psychiatric facility from July 23 through July 30, 2010. Dr. Yanamadala testified that the defendant was diagnosed as suffering from a major depressive disorder. He testified that a major depressive disorder does not ordinarily lead to psychosis, but acknowledged that it could if left untreated. Dr. Yanamadala prescribed Cymbalta for the defendant. He testified that there are "black box" warnings for Cymbalta and that the warnings indicate that there is an increased risk of suicide by adolescents who take the medication. He stated that there is no "black box" warning about an increased risk of homicides by adolescents who take that medication. Dr. Yanamadala testified that it was customary to prescribe Cymbalta for adolescents diagnosed with major depression even though the FDA had not specially approved it for use by that population. Dr. Yanamadala noted that the defendant did not complain about side effects of the medication while he was hospitalized. He also noted that the defendant's condition improved significantly during his stay in the hospital. Dr. Yanamadala opined that when the defendant was discharged on July 30, 2010, he appeared to understand the difference between right and wrong, and he was not insane. Dr. Yanamadala had no further contact with the defendant after he was discharged.

¶ 33    The State also called Dr. Fred Klug, a clinical psychologist, as a rebuttal witness. Dr. Klug testified that 99% of his business is devoted to psychological evaluations. He admitted that he does not provide therapy. Dr. Klug stated that he evaluated the defendant in October 2010 and again in August 2011. He also reviewed the defendant's school records and the medical records from his psychiatric admission at Gateway. Dr. Klug diagnosed the defendant with a conduct disorder. He explained that a conduct disorder is characterized by persistent behavior that violates the basic rights of others. Dr. Klug also felt that the defendant was malingering and that the defendant had engaged in a number of evasive, deceptive, and manipulative tactics to avoid accepting responsibility for his actions. Dr. Klug did not believe that the defendant was psychotic at the time of the murders. He opined that the defendant was sane at the time of the charged crimes and that he understood the criminality of his conduct.

## III. ANALYSIS

¶ 35    On appeal, the defendant challenges the constitutionality of the automatic transfer provisions in the Juvenile Court Act, the constitutionality of the sentencing scheme as applied to juvenile defendants, the propriety of certain procedural and evidentiary rulings by the trial court, and the ineffectiveness of his trial counsel. The State has conceded two points raised by the defendant. We will address those first.

### A. The Constitutional Challenges

¶ 37    The defendant contends that he is entitled to a new sentencing hearing because the imposition of two natural life sentences for offenses he committed when he was 15 years old violates the eighth amendment's prohibition on cruel and unusual punishment under the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2460 (2012). The State agrees that the case must be remanded for resentencing but notes that under *Miller v. Alabama*, the defendant can be sentenced to natural life, provided that the imposition of a life sentence is not mandatory, but discretionary with the trial court.

¶ 38    In *Miller v. Alabama*, the United States Supreme Court held that the mandatory imposition of a life sentence without parole on a person under the age of 18 at the time of their crimes violates the eighth amendment's prohibition on cruel and unusual punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Under *Miller*, a juvenile defendant can be sentenced to natural life in prison without parole, so long as the natural life sentence is at the trial court's discretion and not mandatory. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. *Miller* requires a trial court to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. In *People v. Davis*, 2014 IL 115595, the Illinois Supreme Court recognized the new substantive rule established in *Miller* and concluded that it applies retroactively. Our supreme court noted that *Miller* does not foreclose the penalty of life without parole for a juvenile defendant convicted of murder, provided that the sentencing court has the discretion to impose a different penalty and takes into consideration the offender's youth and attendant characteristics before imposing a sentence. *Davis*, 2014 IL 115595, ¶ 43.

¶ 39    In this case, the court sentenced the defendant to two mandatory terms of natural life, pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2010)), and there is no indication that the court considered the defendant's youth and attendant characteristics before imposing the sentence. The imposition of mandatory life sentences on a juvenile defendant violates the eighth amendment's prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469; *Davis*, 2014 IL 115595, ¶ 43. Accordingly, the defendant's mandatory natural life sentences are vacated and the cause is remanded for a new sentencing hearing in accordance with the guidelines set forth in *Miller*.

¶ 40    The defendant also contends, and the State concedes, that his two convictions for the Mahon-Tish home invasion violate the one-act, one-crime rule and that one of the convictions must be vacated. The one-act, one-crime rule prohibits multiple convictions when the convictions are carved from the same physical act. *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). The Illinois Supreme Court has considered the home invasion statute in light of the one-act, one-crime rule and concluded that the statute will support only one conviction for a single entry into a dwelling, regardless of the number of persons present in the dwelling or the number of persons harmed by the defendant. *People v. Cole*, 172 Ill. 2d 85, 102, 665 N.E.2d 1275, 1283 (1996).

¶ 41    In this case, the defendant was convicted of two counts of home invasion based on a single entry into the Mahon-Tish residence. Therefore, one of the convictions must be vacated. Under the one-act, one-crime rule, the conviction on the more serious offense should be retained and the conviction on the less serious offense should be vacated. See *People v. Garcia*, 179 Ill. 2d 55, 71-72, 688 N.E.2d 57, 64-65 (1997). However, in a case such as this, where a reviewing court cannot determine which of the offenses is more serious based on a review of the cold record, it will remand the case to the trial court for that determination. *Garcia*, 179 Ill. 2d at 71-72, 688 N.E.2d at 64-65. Accordingly, on remand, the trial court is instructed to determine which of the home invasion convictions arising from the single entry into the Mahon-Tish home should be vacated and to enter an order vacating that conviction and the corresponding sentence.

¶ 42    The defendant next contends that the automatic transfer provision of the Juvenile Court Act (705 ILCS 405/5-130(1)(a) (West 2010)) violates the due process clauses of the federal and state constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2), the eighth amendment (U.S. Const., amend. VIII), and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), by automatically prosecuting and sentencing all juveniles charged with certain offenses as adults, with no consideration of their youthfulness.

¶ 43    The constitutionality of a statute is an issue of law that is subject to *de novo* review. *People v. Patterson*, 2014 IL 115102, ¶ 90. A statute carries a strong presumption of constitutionality, and the burden is on the party challenging the constitutionality of a given statute to "clearly establish" that the statute violates constitutional protections. *People v. Sharpe*, 216 Ill. 2d 481, 487, 839 N.E.2d 492, 497 (2005).

¶ 44    The defendant acknowledges that the Illinois Supreme Court has previously rejected claims that the automatic transfer provision violates due process, the eighth amendment, and the proportionate penalties clause in the Illinois Constitution, but argues that the constitutional validity of the provision must be revisited in light of the United States Supreme

Court's decisions in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005).

¶ 45    During the pendency of this appeal, our Illinois Supreme Court issued a decision, *People v. Patterson*, 2014 IL 115102, in which it reviewed the automatic transfer provision in light of the United States Supreme Court's analyses in *Miller*, *Graham*, and *Roper*. In *Patterson*, our supreme court rejected procedural and substantive due process challenges to the automatic transfer provision, reaffirming its decisions in *People v. M.A.*, 124 Ill. 2d 135, 529 N.E.2d 492 (1988), and *People v. J.S.*, 103 Ill. 2d 395, 469 N.E.2d 1090 (1984). See *Patterson*, 2014 IL 115102, ¶¶ 92-95. In *M.A.* and *J.S.*, the court found that the automatic transfer provision reflected the legislature's determination that certain minors are not eligible for continuation in the administrative scheme of the juvenile court and that the automatic transfer provision was rationally based on the age of the offender and the nature of the threat posed by the offense to the victim and the community. *M.A.*, 124 Ill. 2d 135, 529 N.E.2d 492; *J.S.*, 103 Ill. 2d at 403-04, 469 N.E.2d at 1094-95. The court further found that the automatic transfer provision did not violate procedural due process because it does not allow for any disparity in treatment between the individuals within its classification, and that it does not deprive them of a meaningful opportunity to be heard. *M.A.*, 124 Ill. 2d 135, 529 N.E.2d 492; *J.S.*, 103 Ill. 2d at 404-05, 469 N.E.2d at 1095. The court also rejected the defendant's attempt to rely on the eighth amendment analyses in *Miller*, *Graham*, and *Roper* to support his due process claims, noting that a challenge raised under one constitutional theory cannot be supported by decisions based purely on another constitutional provision. *Patterson*, 2014 IL 115102, ¶ 97.

¶ 46    In *Patterson*, a majority of the court rejected eighth amendment and proportionate penalties challenges to the automatic transfer provision. The court concluded that the provision does not impose any form of punishment, but directs that a small class of juvenile defendants, who are charged with specific, serious crimes, will be tried in adult criminal court. *Patterson*, 2014 IL 115102, ¶¶ 104-06. The majority found that the provision is procedural rather than punitive and that, as such, there is no violation of the eighth amendment's prohibition against cruel and unusual punishment, and no violation of the proportionate penalties clause of the Illinois Constitution. *Patterson*, 2014 IL 115102, ¶ 106. The majority concluded that the automatic transfer provision was not unconstitutional, but it strongly urged the legislature to review the statute based on the current scientific and sociological evidence which indicates a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in the juvenile cases. *Patterson*, 2014 IL 115102, ¶ 111. In this case, the defendant has provided no basis on which to distinguish or deviate from *Patterson*, *J.S.*, and *M.A.* Based upon the existing precedent, we reject the defendant's claims that the automatic transfer provision in the Juvenile Court Act is unconstitutional.

¶ 47                     B. The Voluntariness of the Defendant's Statements

¶ 48    The defendant contends that the trial court erred in denying his motion to suppress his confession because he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights before he was interviewed by the police on August 4, 2010. The defendant points to several facts in support of his claim that his statements were involuntary, including that he was 15 years old, that he had no opportunity to consult with a concerned adult, that he was in

- 11 -

a hospital and handcuffed to a bed, that he was sleep-deprived and intoxicated, that he was taking prescription medication for a major depressive disorder, and that he had undergone two painful procedures, a blood draw and the placement of a catheter, shortly before he was questioned by the police.

¶ 49   In reviewing a ruling on the voluntariness of a juvenile confession, the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence, but its decision on the ultimate question of whether a confession was voluntary is subject to *de novo* review. *People v. Murdock*, 2012 IL 112362, ¶ 29.

¶ 50   To determine the voluntariness of a confession, courts consider the totality of the circumstances, including factors such as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. *Murdock*, 2012 IL 112362, ¶ 30; *In re G.O.*, 191 Ill. 2d 37, 54-55, 727 N.E.2d 1003, 1012 (2000). Courts also consider other factors, including the legality and duration of the detention, the length of the interview, whether there was any physical or mental abuse by the police, whether the police made any threats or promises, whether a concerned adult was present either before or during the interrogation, and whether the police made attempts to prevent or frustrate the minor and a concerned adult from conferring. *In re G.O.*, 191 Ill. 2d at 54-55, 727 N.E.2d at 1012. The test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether his will was overcome at the time he confessed, and no single factor is dispositive. *In re G.O.*, 191 Ill. 2d at 54-55, 727 N.E.2d at 1012.

¶ 51   During the suppression hearing in this case, the trial court heard from a number of witnesses regarding whether the defendant knowingly and voluntarily waived his *Miranda* rights. The court also viewed the video of the defendant's interview with the police. The court found that the evidence overwhelmingly established that the defendant's statements were made freely, voluntarily, and without compulsion or inducement of any sort and that the defendant's will was not overcome at the time he confessed. After reviewing the testimony and evidence offered during the suppression hearing, including the defendant's videotaped statement, we cannot find that the trial court's factual findings and credibility determinations are against the manifest weight of the evidence.

¶ 52   We now consider whether the statements were voluntary, based on the totality of the circumstances. The record indicates that the defendant was 15 years, 8 months old at the time he was questioned. He had an IQ of 85 and had completed eighth grade. He attended an alternative school due to misconduct issues, including fighting with other students, at his grade school. By all accounts, the defendant was sleeping soundly when Agent Gallatin arrived to question him. Agent Gallatin set up the video recorder and then woke up the defendant. There was no preinterview questioning of the defendant. The duration of the interrogation was approximately 48 minutes.

¶ 53   The video recording shows that Agent Gallatin initially told the defendant that he wanted to find out what had happened. Agent Gallatin noted that he had spoken with the defendant's father and that the defendant's father had given permission for the interview. Agent Gallatin read each of the *Miranda* warnings to the defendant, and the defendant orally indicated that he understood each warning. The defendant was able to sign the written form. Based on our review of the recorded interview, Agent Gallatin did not engage in any behavior that would be considered abusive or coercive. He did not make any promises or threats, and he did not

use trickery in order to extract information from the defendant. The defendant did not ask for a lawyer prior to or during the interview. He did not seek to confer with his father or another concerned adult prior to or during the interview. There is no evidence that the defendant's father attempted to get in touch with the defendant after he was taken to the hospital. The defendant's father did not deny that he had given Agent Gallatin permission to interview the defendant to find out what had happened.

¶ 54        The defendant did not appear to be physically or mentally distressed during the interview. He appeared to understand Agent Gallatin's questions, and his answers were responsive to the questions posed. We do note that the defendant appeared to be drowsy when the questioning began, that he took some time to process the questions, and that he spoke in a very soft voice. But the defendant did not appear confused about the process, and he gave responsive answers. At different points during the interview, Agent Gallatin asked the defendant if he understood what was happening, and the defendant indicated that he understood.

¶ 55        We also note that the defendant was handcuffed to the bedrails during the interview, but the video shows that the defendant had some ability to move his arms. In addition, the tenor of the interview was not coercive. Given the nature of the crimes that had been committed and the defendant's agitation, and at times combative behavior prior to his arrest, the detention does not appear to be unreasonable. Two juvenile officers were present during the interrogation. There is no evidence that either was adversarial toward the defendant. The evidence shows that Trooper Heselton ensured that the defendant was aware of his *Miranda* rights and that he was treated properly while at the hospital. While the circumstances of the interview were not perfect, we find, based on the totality of the circumstances, that the defendant's statements were voluntary and not the result of coercion, deceit, or an overborne will. The trial court did not err in denying the defendant's motion to suppress.

¶ 56                        C. Evidentiary and Procedural Challenges

¶ 57        The defendant contends that the trial court erred in allowing evidence that two weeks prior to the murders, he shot his dog and dragged it onto the railroad tracks before he attempted suicide. The defendant acknowledges that the evidence that he shot himself was relevant to his state of mind and mental health issues. He claims that the evidence that he shot his dog and dragged it onto the railroad tracks before turning the gun on himself, and the photographs depicting the dog lying on the tracks, constituted other crimes evidence which was unfairly prejudicial.

¶ 58        Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). Other crimes evidence includes misconduct that occurred prior to the charged offenses, and it is admissible to establish state of mind. *People v. Norwood*, 362 Ill. App. 3d 1121, 1128, 841 N.E.2d 514, 522 (2005). The trial court may exclude other crimes evidence, even if the evidence is relevant, if the danger of unfair prejudice substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 364-65, 583 N.E.2d at 519; *Norwood*, 362 Ill. App. 3d at 1129, 841 N.E.2d at 522.

¶ 59        In this case, the evidence was offered to show the defendant's state of mind and to rebut the defendant's defense that the use of Cymbalta, as prescribed, resulted in involuntary

intoxication such that the defendant was unable to appreciate the criminality of the conduct. The trial court instructed the jury that the evidence could only be used for the limited purpose of the defendant's state of mind, and we presume the jury followed the court's instruction. After reviewing the record, we find that the evidence was relevant to the defendant's state of mind and that it was not so prejudicial as to substantially outweigh its probative value. We find no error in its admission.

¶ 60      The defendant next contends that he was deprived of a fair trial when the trial court denied his motion for a change of venue based on pretrial publicity.

¶ 61      A defendant is entitled to a change of the place of trial if the trial court has reasonable grounds to believe that prejudice against the defendant actually exists and that, by reason of that prejudice, there is a reasonable apprehension that the defendant cannot receive a fair and impartial trial. *People v. Olinger*, 112 Ill. 2d 324, 343, 493 N.E.2d 579, 588 (1986). A change of the place of trial should be granted when it becomes apparent that it will be impossible to find 12 jurors sufficiently unfamiliar with the details of the case to withstand a challenge for cause. *Olinger*, 112 Ill. 2d at 343, 493 N.E.2d at 588-89.

¶ 62      Exposure to pretrial publicity is not enough to demonstrate prejudice. *People v. Kirchner*, 194 Ill. 2d 502, 529, 743 N.E.2d 94, 108 (2000). Jurors need not be totally ignorant of the facts and issues involved, but it is essential that the people who are ultimately chosen as jurors must be able to lay aside impressions or opinions and render a verdict based on the evidence admitted at trial. *People v. Sutherland*, 155 Ill. 2d 1, 16, 610 N.E.2d 1, 7 (1992). In evaluating a defendant's claim that the jury was prejudiced due to pretrial publicity, the reviewing court must consider the entire record, including the *voir dire*, to determine independently whether the defendant received a fair trial. *Kirchner*, 194 Ill. 2d at 529, 743 N.E.2d at 108.

¶ 63      The record shows that this case was originally set for trial in May 2011, but was continued and rescheduled for August 2011. Prior to the initial setting, a few of the potential jurors had requested to be excused. The trial court was notified of these requests and recognized that the case required a larger jury pool. Once the trial date was reset, the trial court notified the parties that 120 potential jurors would be summoned. Prior to *voir dire*, the potential jurors were asked to complete a questionnaire. The court reviewed each questionnaire and determined that only one potential juror would be excused for cause because of the answers in the questionnaire.

¶ 64      The potential jurors were questioned in groups of 14. The court denied the defendant's request for individual *voir dire*, but it permitted potential jurors the opportunity to answer more personal questions in private. The record shows that a number of the potential jurors were excused for cause during *voir dire*. Some jurors were excused after admitting that they had prejudged the case. Several others were excused because they personally knew one or more of the victims or family members of the victims, or because they admitted a bias for or against the State's Attorney or a particular witness. A few others were excused for health or family issues, and one could not consider an insanity defense. The record shows that a jury of 12 and 2 alternates were selected before the pool of 120 potential jurors was exhausted. The jurors who were seated stated that they could be fair and impartial and that they would decide the case based solely on the evidence presented in court. The defendant has not established that the jury was prejudiced against him due to pretrial publicity. After reviewing the entire

record, including the *voir dire*, we conclude that the trial court did not err in denying the defendant's motion for a change of venue.

¶ 65    Next, the defendant claims that he received ineffective assistance of counsel when his trial attorneys relied on the defense of insanity at trial, but then chose not to tender jury instructions on that defense.

¶ 66    During the jury instruction conference, the defense team notified the court that it would tender instructions on involuntary intoxication, but would not tender instructions on "not guilty by reason of insanity" or "guilty but mentally ill." The court asked if this was a matter of trial strategy. One of the defendant's lawyers stated that it was the defendant's right to decide whether to pursue an insanity defense. Another stated that he believed it was "indirectly" trial strategy. The court then asked the defendant if he had consulted with his lawyers about whether to submit instructions on the insanity issue. The defendant replied that he had consulted with his attorneys, that he accepted their advice, that he did not need additional time for consultation, and that he did not want the jury instructed on the insanity defense.

¶ 67    In order to establish a claim of ineffective assistance of counsel, the defendant must show that his counsel's performance was objectively substandard and that but for the deficient performance, there is a reasonable probability that the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). In order to establish an insanity defense, the defense must show by clear and convincing evidence that the defendant lacked the substantial capacity to appreciate the criminality of his conduct because of a mental disease or mental defect. 720 ILCS 5/6-2 (West 2010).

¶ 68    In this case, Dr. Slomowitz opined that the defendant was insane at the time of the murders. She stated that he was unable to appreciate the criminality of his conduct because of a mental defect caused by the prescription medication he was taking. During cross-examination, Dr. Slomowitz testified that the defendant's psychosis resulted from the prescription medication and all the other intoxicants he had taken. In addition, the State cast doubt on her testimony regarding the "black box" warnings and pointed out that in her preliminary report she had opined that the defendant was not insane when he murdered the second victim. The State also presented rebuttal experts to cast doubt on the insanity defense. Dr. Yanamadala testified that he prescribed Cymbalta for the defendant, and that the defendant did not complain of or display any side effects from that medication while in the hospital. Dr. Klug opined that he found no evidence to indicate that the defendant was psychotic when he murdered Mike Mahon and Debra Tish. He noted that certain actions by the defendant showed that he was aware of the criminality of his conduct.

¶ 69    The record shows that the defense's primary theory was that the defendant could not appreciate the criminality of his conduct due to an involuntary intoxication resulting from his prescription medication, and that the evidence supporting the insanity defense was not very strong. The defendant was questioned about his decision to abandon the insanity defense, and at that time he indicated he had consulted with his attorneys and agreed with their advice. The record shows that the defense team's decision to forgo instructing the jury on insanity was a matter of trial strategy which was made after considering the law, the facts, the evidence as it played out during the trial, and the available options. *People v. Whitehead*, 169 Ill. 2d 355, 390, 662 N.E.2d 1304, 1320 (1996), *overruled in part on other grounds by*

*People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998). Though the jury ultimately rejected the defendant's involuntary intoxication theory, an unsuccessful defense strategy, by itself, does not prove ineffective assistance of counsel. *People v. Cundiff*, 322 Ill. App. 3d 426, 435, 749 N.E.2d 1090, 1098 (2001). The defendant has not shown that the decision not to instruct the jury on insanity constituted ineffective assistance of counsel.

¶ 70   Next, the defendant contends that the trial court erred in prohibiting his neuro-pharmacology expert, Dr. Lipman, from offering his opinion on the effect of Cymbalta on the defendant's state of mind at the time of the crimes, and from offering statistics regarding the adverse effects of Cymbalta with respect to violent or aggressive behaviors.

¶ 71   In this case, Dr. Lipman prepared a preliminary report in which he discussed the effects of Cymbalta on adolescents in general and the defendant in particular. Dr. Lipman concluded that at the time of the crimes, the defendant was experiencing adverse effects of Cymbalta, and that he was not capable of making reasoned decisions or of controlling his behavior. The State filed a motion *in limine* asking that Dr. Lipman be prohibited from rendering an opinion concerning the defendant's state of mind at the time of the crimes because he did not have a doctorate in psychology or psychiatry and therefore lacked the necessary qualifications to render an expert opinion on that subject. The trial court agreed. The court entered an order permitting Dr. Lipman to testify about the effects of Cymbalta on adolescents in general, but prohibiting him from giving opinions about the effects of Cymbalta on the defendant's state of mind when he committed the crimes.

¶ 72   Under Illinois law, medical doctors, psychiatrists, and licensed clinical psychologists are deemed statutorily qualified to testify as expert witnesses on the issue of a defendant's insanity or mental illness. See 730 ILCS 5/5-2-5 (West 2010); *People v. Lowitzki*, 285 Ill. App. 3d 770, 779, 674 N.E.2d 859, 864-65 (1996). Dr. Lipman is a neuropharmacologist. He is not a medical doctor, a psychiatrist, or a licensed clinical psychologist, and therefore he did not possess the statutory qualifications required to offer an expert opinion on the issue of the defendant's sanity or mental illness. *Lowitzki*, 285 Ill. App. 3d at 779, 674 N.E.2d at 865. Based on the record, we cannot say that the trial court abused its discretion in limiting Dr. Lipman to discussing the adverse effects of Cymbalta on adolescents in general.

¶ 73   On August 12, 2011, the defense produced a revised report from Dr. Lipman. The report contained previously undisclosed statistical information regarding the adverse effects of Cymbalta. The State filed a motion to prohibit Dr. Lipman from testifying about the statistical information contained in his revised report. The State claimed that the report contained new opinions that could have been disclosed in the initial report or within a few weeks of the court's ruling on the State's initial motion *in limine*. The court agreed and barred Dr. Lipman from discussing the statistical information at trial.

¶ 74   Under Illinois Supreme Court Rule 415, evidence may be excluded as a sanction for a discovery violation. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971). Factors that a trial court should consider in determining whether to exclude evidence as an appropriate discovery sanction include the effectiveness of a less severe sanction, the materiality of the witness's proposed testimony to the outcome of the case, the prejudice to the other party, and the evidence of bad faith in the violation of the discovery rules. *People v. Scott*, 339 Ill. App. 3d 565, 572-73, 791 N.E.2d 89, 94-95 (2003). The imposition of sanctions for violations of discovery rules is reviewed under an abuse of discretion standard. *People v. Ramsey*, 239 Ill. 2d 342, 429, 942

N.E.2d 1168, 1216 (2010); *People v. White*, 257 Ill. App. 3d 405, 413-14, 628 N.E.2d 1102, 1108-09 (1993).

¶ 75 In this case, the defense produced Dr. Lipman's revised report two days before jury selection was to commence, and the report contained material that had not been previously disclosed. There was no offer of proof, so it is difficult to determine the value of the statistical evidence to the defense. The State noted that it would need additional time to prepare for cross-examination and that it was unprepared to rebut the statistics without an expert. A continuance would have been fraught with problems. One hundred twenty citizens had been summoned to report for jury duty in two days, and witnesses had been subpoenaed. The trial had already been continued once based on a last-minute decision by the defense team to present an insanity defense. The defendant has not established that he was unfairly prejudiced by this discovery sanction. Based on this record, we cannot say that the trial court abused its discretion in prohibiting Dr. Lipman from testifying about previously undisclosed statistical information regarding adverse effects of Cymbalta.

¶ 76 In his supplemental brief, the defendant contends that the Krajefska home invasion did not arise out of the same incident as the Mahon-Tish murders. As such, the defendant argues that the circuit court did not have jurisdiction over the charge alleging home invasion and injury to Randy Krajefska (count VII), in the absence of a transfer order from the juvenile court.

¶ 77 Under section 5-130(1)(a) of the Juvenile Court Act, a minor who is charged with one of several enumerated offenses, including first degree murder, and who was at least 15 years old at the time of the offense, is automatically excluded from the jurisdiction of the juvenile court, and shall be prosecuted as an adult for that offense and for all other charges arising out of the same incident. 705 ILCS 405/5-130(1)(a) (West 2010).

¶ 78 The defendant correctly notes that home invasion is not one of the crimes that is subject to automatic exclusion. The defendant contends that the Krajefska home invasion did not arise from the same incident as the Mahon-Tish murders, and that the circuit court lacked jurisdiction over the charge because it had not been transferred from the juvenile court. The defendant claims that the Krajefska home invasion and the Mahon-Tish murders were separate incidents because the weapons used were different, the locations were different, and the motivations were different. He also claims that the Krajefska incident was not dependent on or subordinate to the Mahon-Tish murder.

¶ 79 After reviewing the record, we do not think that the evidence supports a finding that the Krajefska home invasion and the Mahon-Tish murders arose from separate incidents. While there is no definite time line, the defendant's own statement indicates that he committed the home invasion at the Krajefska residence within moments after leaving the Mahon-Tish residence and that this was an uninterrupted course. The record shows the offenses were committed in neighboring homes and involved the use of a weapon. The crimes were closely linked in time, in location, and in manner. See *People v. Lesure*, 408 Ill. App. 3d 12, 20-21, 944 N.E.2d 780, 787 (2011). The defendant's claim that there were different motives for the Mahon-Tish murders and the Krajefska home invasion is not based on any evidence in the record. There is no evidence of a motive for any of these crimes. Based on this record, we find that the Mahon-Tish murders and the Krajefska home invasion arose out the same incident. Accordingly, the Krajefska home invasion was properly prosecuted under the criminal law in the circuit court.

¶ 80    The defendant argues, in the alternative, that if the Mahon-Tish murders and the Krajefska home invasion arose out of the same incident for purposes of jurisdiction in the circuit court, then those charges were subject to compulsory joinder. The defendant further argues that the filing of the Krajefska home invasion charge more than 120 days after he was arrested and charged with the Mahon-Tish offenses violated his statutory right to a speedy trial and required dismissal of the Krajefska home invasion charge. We disagree.

¶ 81    Section 3-3 of the Criminal Code of 1961, commonly called the compulsory joinder statute, requires joinder if multiple offenses are known to the prosecutor at the time of commencing the prosecution and are within the jurisdiction of a single court, and if the charges are based on the same act. 720 ILCS 5/3-3 (West 2010). There is no requirement of joinder where multiple offenses arise from a series of related acts in the course of a single incident. See *People v. Gooden*, 189 Ill. 2d 209, 219, 725 N.E.2d 1248, 1254 (2000); *People v. Mueller*, 109 Ill. 2d 378, 385-86, 488 N.E.2d 523, 526-27 (1985). The compulsory joinder provision was never intended to cover situations in which several offenses arise from a series of distinct, but closely related acts in the course of a single incident. *Gooden*, 189 Ill. 2d at 219-20, 72 N.E.2d at 1254; *Mueller*, 109 Ill. 2d at 385, 488 N.E.2d at 526. In this case, the Krajefska home invasion and the Mahon-Tish home invasion and murders arose from a series of distinct, but closely related acts in the course of a single incident, and so there was no requirement of joinder. *Gooden*, 189 Ill. 2d at 219, 725 N.E.2d at 1254; *Mueller*, 109 Ill. 2d at 386, 488 N.E.2d at 526-27. Because the Krajefska home invasion charge was not subject to compulsory joinder, it was not subject to the same speedy trial period as the original Mahon-Tish charges. *Gooden*, 189 Ill. 2d at 220-22, 725 N.E.2d at 1254-55. The defendant's ineffective assistance of counsel claim, based on his defense team's failure to file a motion to dismiss the Krajefska home invasion count on speedy trial grounds, cannot be sustained.

¶ 82                                    IV. CONCLUSION

¶ 83    For the reasons stated, the defendant's mandatory natural life sentences are hereby vacated, and this cause is remanded to the circuit court for a new sentencing hearing. On remand, the circuit court is instructed to determine which of the two Mahon-Tish home invasion charges constitutes the less serious offense, and to vacate the conviction and corresponding sentence on the less serious charge and correct the sentencing order. In all other respects, the judgment is affirmed.

¶ 84    Affirmed in part, vacated in part, and remanded with instructions.